Troy A. Brenes, SBN 249776
**BRENES LAW GROUP, P.C.**
100 Spectrum Center Drive, Ste. 330
Irvine, California 92618
Tbrenes@breneslawgroup.com
Telephone: (949) 397-9360
Facsimile: (949) 607-4192

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ANDREW KNIGHT, an individual

     *Plaintiff,*

vs.

C.R. BARD, INC., a foreign corporation, and
BARD PERIPHERAL VASCULAR, INC., an
Arizona corporation, and DOES 1-10

     *Defendants.*

**COMPLAINT FOR   DAMAGES**

1. **NEGLIGENCE**
2. **STRICT LIABILITY FAILURE TO WARN**
3. **STRICT LIABILITY MANUFACTURING DEFECT**
4. **BREACH OF EXPRESS WARRANTY**
5. **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
6. **FRAUDLEMENT CONCEALMENT**
7. **NEGLIGENT MISREPRESENTATION**
8. **FRAUDLEMENT MISREPRESENTATION**

**DEMAND FOR A JURY TRIAL**

Plaintiff, ANDREW KNIGHT, by and through his undersigned attorneys, hereby sues

Defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC. (collectively

"Bard"), and DOES 1-10 and alleges as follows:

COMPLAINT

1

## PARTIES

**Plaintiff**

1.    ANDREW KNIGHT (hereinafter "Plaintiff"), at all times relevant to this action is and was a citizen of the state of California.  On or about March 5, 2010, Plaintiff underwent placement of a Bard G2® Express Filter System Reference number RF400F, Lot number GFTH3217 ("G2 Express Filter") at Washington Hospital in California. The device subsequently malfunctioned by, *inter alia*, tilting, perforating his vena cava, fracturing. Due to the malfunction of the filter, Dr. Kou at Stanford Hospital performed a complex procedure on or about January 21, 2016 to remove the G2 Express Filter and to venoplasty and stent the vein. While the main portion of the device was removed, two fractured struts had migrated outside the vena cava and could not be retrieved. Plaintiff also suffered a procedure complication of "retroperitoneal mass secondary to IVC tear" from the IVC filter removal procedure.

**Defendants**

2.    Defendant C.R. Bard, Inc. ("Bard") is a foreign corporation with its principal place of business and state of incorporation being in New Jersey. Bard is authorized to do business in California and said Defendant was doing business in California, and at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the G2® Express Filter to be implanted in patients such as the Plaintiff throughout the United States, including California.

3.    Defendant Bard Peripheral Vascular, Inc. ("BPV") is a foreign corporation with its principal place of business and state of incorporation being in Arizona. BPV is a wholly owned subsidiary corporation of Bard and is authorized to do business in California and said Defendant was doing business in California. At all times relevant to this action, BPV designed,

COMPLAINT

set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the G2 Express filter to be implanted in patients such as the Plaintiff throughout the United States, including California.

4.     The true names and capacities of those Defendants designated as DOES 1 through 10, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiff at the time of filing this Complaint, and Plaintiff, therefore has sued said Defendants by such fictitious names. When the true names, identities or capacities of said fictitiously designated defendants are ascertained, Plaintiff will seek leave of court to amend this complaint to insert the true names, identities, and/or capacities of DOE Defendants, together with the proper charging allegations.

5.     Plaintiff believes, and therefore alleges, that each unknown Doe Defendants 1-10 are, in some manner, legally responsible for the events and happenings set forth in this Complaint, and proximately caused injury and damages to Plaintiffs, as alleged herein.

6.   All references to "Bard" or "Defendants" hereafter shall refer to Defendants Bard, BPV and Does 1-10.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) (1) because the Plaintiff and the Defendants are citizens of different states, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), excluding interest and costs.

8.     Venue is proper in this Court, as the facts and circumstances leading to injuries occurred in Alameda County, California. Further, the G2 Express Filter that is the subject of this action was sold and purchased in Alameda County, California. Furthermore, the Defendant's

COMPLAINT

herein were authorized to conduct business in the State of California and did conduct business in Alameda County, California.

## GENERAL FACTUAL ALLEGATIONS

### A.    INFERIOR VENA CAVA FILTERS GENERALLY

9.      Inferior vena cava ("IVC") filters first came onto the market in the 1960's. Over the years, medical device manufacturers have introduced several different designs of IVC filters.

10.     An IVC filter is a device that is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters may be designed to be implanted, either permanently or temporarily, in the human body, more specifically, within the inferior vena cava.

11.     The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body. In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Often times, these thrombi develop in the deep leg veins. These thrombi are called "deep vein thrombosis" or "DVT". Once thrombi reach the lungs, they are considered "pulmonary emboli" or "PE". Pulmonary emboli present significant risks to human health.

12.     These devices have only been cleared by the FDA to prevent recurrent pulmonary embolism where anticoagulants are contraindicated or have failed. Thus, any use in a patient without a history of pulmonary embolism, is an off-label use.

13.     Of note, Bard's internal documents as well as recent medical literature establish that there is no proven benefit to these devices.

COMPLAINT

14.     Those people at risk for DVT/PE can undergo medical treatment to manage the risk. For example, a doctor may prescribe anticoagulation medications such as Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood. In some people who are at high risk for DVT/PE, or who are not candidates for anticoagulation medications may require the permanent or temporary implantation of an IVC filter to prevent thromboembolic events.

15.     As indicated above, IVC filters have been on the market for decades. The first IVC filters marketed were permanent filters. These devices were designed to be implanted into the IVC permanently. These permanent filters have long-term follow-up data (of up to 20 years and longer) regarding their use. Beginning in 2003, manufacturers also began marketing what are known as optional or retrievable filters. These filters are marketed as being designed to be left in permanently or having the option to retrieve once the risk of pulmonary embolism has passed.

**B.     THE RECOVERY FILTER®**

**i.  Simon Nitinol Filter and Bard's Reasoning For Retrievable Filters**

16.     Bard has distributed and marketed the Simon Nitinol Filter in the United States since 1992.  The Simon Nitinol Filter is a permanent IVC filter, which has an excellent safety record and is still sold by Bard today.  Bard modified the design of the Simon Nitinol Filter in order to make a device that was supposed to be equally safe to leave in permanently and/or could be retrieved once the risk of pulmonary embolism had passed. The modified device was ultimately marketed as the Recovery® Filter System ("Recovery Filter").

17.     Bard's stated purpose in designing the Recovery Filter was to increase the overall size of the market for these devices through off-label promotion and to increase Bard's percentage of that market. Specifically, Bard marketed the device for patients that were at risk for DVT and PE but that had not actually ever had a pulmonary embolism as required by the

5

COMPLAINT

FDA label. These included patients who were immobilized for periods of time, e,g, orthopedic patients; bariatric patients, and cancer patients.

18.      Of note, prior to the Recovery filter being cleared for use by the FDA, Bard was losing market share in an IVC Filter market that was reported to be worth $100,000,000 in sales. In July 2001, Bard's overall market share was 16-17%. By March 2003, Bard's market share was down to 11-12%.

19.      Bard's marketing Manager explained Bard's marketing plan for the Recovery Filter in a March 28, 2003 Market Appraisal Memorandum. She wrote , "Users can be swayed by ease of use, low profile and aggressive marketing even in the absence of solid clinical history and in spite of negative clinical experience."

### i.  FDA Clearance

20.      In 2002, Bard and BPV submitted a notification to market the Recovery Filter System for the prevention of recurrent pulmonary embolism by placement in the inferior vena cava.[1]  On November 27, 2002, the FDA cleared the device for sale and use in the prevention of recurrent pulmonary embolism via *permanent* placement in the vena cava.

21.      In April 2003, Bard submitted a notification of intent to market and sell the

---

[1] Bard and BPV submitted the notification under Section 510(k) of the United States Food, Drug and Cosmetic Act ("Act") of 1976 (21 U.S.C. 321 *et seq*).  The 510(k) review process requires any entity engaged in the design, manufacture, distribution or marketing of a device intended for human use to notify the FDA 90 days before it intends to market the device and to establish that the device is substantially equivalent to a legally marketed predicate device. (21 C.F.R. §§ 807.81, 807.92(a)(3)).  Substantial equivalence means that the new device has the same intended use and technological characteristics as the predicate device. This approval process allows a manufacturer to bypass the rigorous safety scrutiny required by the pre-market approval process.

COMPLAINT

Recovery Filter for the additional intended use of *optional retrieval* and Bard received FDA clearance to begin marketing the Recovery Filter as both a permanent and retrievable filter on or about July 25, 2003.

22.    Ultimately, Bard's plan to promote its retrievable devices for off-label uses and for unproven benefits succeeded.  By 2009, the overall market share for IVC filters had tripled, moreover, Bard's percentage of that market share has increased from 11-12% to 42%.

23.    Bard's marketing claims made to all physicians, included, that the Recovery Filter was safer than all previously available filters, including the Simon Nitinol Filter. As will be discussed below this claim was false.

### ii.    The Design Recovery Filter

24.    The Recovery Filter is conical in shape and it consists of two (2) levels of six (6) radially distributed NITINOL struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots. There are six short struts, which are commonly referred to as the arms, and six long struts, which are commonly referred to as the legs. Each strut is held together by a single connection to a cap located at the top/apex of the device. According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" within the vena cava, and the long struts with attached hooks are designed to primarily prevent the device from migrating from "normal respiratory movement" or even massive pulmonary emboli.

25.    The Recovery filter is inserted percutaneously by a deployment catheter that is guided by a physician through a blood vessel into the inferior vena cava.  The Recovery Filter is designed to be retrieved in a similar fashion.  The deployment device is part of the Recovery Filter System.

COMPLAINT

26.     The Recovery Filter included several design changes from the Simon Nitinol Filter. These include, but are not limited to, the following:

    a.  decreasing the leg span of the device;

    b.  decreasing the hook diameter of each hook on the leg struts;

    c.  decreasing the radial force of the struts; and

    d.  changing the closed petal arm strut design to an open arm strut design.

    **iii.     Bard's Design Efforts Were Inadequate**

27.     Each of the design changes referenced above substantially reduced the Recovery Filter's stability and structural integrity.

28.     However, because Bard failed to conduct adequate testing and research to understand the anatomy of where the device would be placed and what forces it would be exposed to when used in a reasonably foreseeable manner, Defendants failed to realize that these design changes would result in the device not being reasonably safe for user needs.

29.     In a 2009 Bard IVC Filter franchise review, Bard's Filter Franchise Team admits that Bard's weakness have been a:

    a.  Lack of thorough understanding dynamics of caval anatomy – impacting testing methods;

    b.  We have a historical reactive/evolution design mindset;

    c.  Product complications – forcing focus on reactive designing;

    d.  Limited understanding of user needs.

30.     Due to Bard's lack of understanding of caval anatomy and the forces the device would be exposed to once implanted, Bard set design specifications that were not clinically relevant and did not account for the forces these devices would actually see when implanted in

8

COMPLAINT

the human body.   For instance, Bard's decision to set the minimum safety standard regarding migration resistance at 50 mmHg reflected a complete lack of understanding of the forces this device could be exposed to once implanted.

31.     Bard also failed to test the device under reasonably foreseeable conditions that the device could be exposed to when used in an intended and expected manner. Among other things, Bard knew that these devices could be placed in appropriately sized vena cavas that subsequently expanded beyond 28 mm in diameter. Bard knew that this decreased migration resistance if the device was challenged by a clot and could lead to migration if the vena cava expanded beyond the leg span of the filter, such that the hooks were no longer in touch with the vena cava walls. Yet Bard chose not to test the device to simulate how it would perform if caval distension were to occur. Bard also failed to test the device to determine how it would perform if tilted, fractured, or perforating the vena cava in respect to stability and structural integrity. Bard also failed to test the device for fracture resistance under reasonably foreseeable conditions.

### iv.    Pre-Market Expectations

32.     Prior to introducing the Recovery Filter to market Bard and Physicians expected that a properly placed filter would not migrate or fracture from in vivo forces. Bard's internal documents repeatedly support this point:

    a.   Bard filed patents for its retrievable filters, which state "An elastic hook is formed on the free end of an appendage to pierce the vessel wall and insure that the filter does not migrate in response to normal respiratory functions or in the event of a massive pulmonary embolism."),

    b.   Bard's Product Performance Specifications for its retrievable filters state that the "user need" that must be met is a device that must not migrate.

9

COMPLAINT

c. Bard's pre-market design and testing documents state that if a clot challenges a filter "pressure below the filter increases significantly and tends to drive the filter toward the heart" and that "the device must not migrate in response to such a challenge."

d.  In a June 2004 Health Hazard Evaluation, Bard's Medical Director states that clot induced migrations are a malfunction of the device and a failure to carry out its intended function.

e. Bard's own quality engineers working on the retrievable filter projects admit that if one of its filters is driven into the heart by a clot challenge, then the device failed to perform as intended.

f. In 2004, Bard conducted a physician focus group regarding what were the expected complications from IVC filters. The physicians reported that an IVC Filter must not migrate no matter how big a clot is.

g. Bard's pre-market finite element analysis regarding fatigue resistance predicted fractures would never occur from in vivo forces.

33.    Bard and physicians further expected that Bard's retrievable filters would perform at least as safely and effectively as Bard's permanent filter. For example:

a. BPV's Vice-President of Quality Assurance, Doug Uelmen and C.R. Bard, Inc.'s Medical director, Dr. Ciavarella, both admit that a device that fails to perform as safely and effectively as a predicate device is adulterated and misbranded under federal law and company must stop selling it.

b. Bard marketed the Recovery, G2, and G2 Express as being substantially safer than all previous IVC filters, including the Simon Nitinol Filter.

c.  In 2004, Bard conducted a physician focus group regarding what were the expected complications from IVC filters. The physicians reported that "A retrievable filter is expected to perform just as well as a permanent filter."

### v.  Bard's Post-Market Surveillance Revealed Recovery Filter Did Not Perform as Expected.

34.  Once the Recovery Filter was released to market, Bard became aware from reported complaints, its own investigations, and epidemiological studies that the design changes made from the Simon Nitinol Filter to its Recovery Filters had the unintended result of substantially reducing the stability and structural integrity of the device.

35.  Thus, even when properly placed, the Recovery Filter would move, fracture, and or perforate the vena cava when exposed to normal and expected in vivo forces. These failures resulted in numerous deaths and other serious injuries.

36.  Moreover, Bard was aware that these failures and resulting injuries were far more likely to occur with the Recovery Filter versus other available IVC Filters. For instance:

a.  Multiple studies have reported Bard's Recovery Filter to have a fracture and migration rate ranging from 21% to 31.7%.

b.  In June 2004, Bard's divisional head of Quality Assurance, Doug Uelmen, admitted: "Bard has been in the permanent filter market for 10 years (SNF). We have had a great deal of experience with a traditional patient base, experiencing a very low and unremarkable adverse event rate. We have now moved into the optional filter market with RNF and have experienced an increased failures."

c.  By July 2004, Bard was aware that the Recovery Filter has a reported fracture rate that was 28 times higher than all other devices

d.  In December 2004, Bard performed a risk assessment of the Recovery Filter, which analyzed reported failure rates, and concluded: "Reports of death, filter migration (movement), IVC perforation, and filter fracture associated with Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 higher, respectively, than reporting rate for all other filters.  These differences were all statistically significant, Recovery's reporting rates for all adverse events, filter fracture, filter migration, and filter migration deaths were found to be significantly higher than those for other removable filters." Dr. Ciavarella, Bard's Medical Director, concluded that this risk (substantially higher reported failure rates) was not known or obvious to consumers, and that Bard should consider providing a warning regarding the increased reporting rate.

e.  By December 2004, BPV's Vice President of Quality Assurance, Doug Uelmen, admits that according to Bard's own policy and procedure for when devices should be recalled, the Recovery filter was considered unreasonably dangerous for human health and required product correction.

37.  These failures are attributable, in part, to the fact that the Recovery Filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

38.  In addition to design defects, the Recovery Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the absence of electropolishing and the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the device

while *in vivo*. In particular, the Recovery Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the Recovery Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to failure.

### iv.    Bard's Design Review Regarding Migration Failures

39.    In late 2003, as migrations failures for the Recovery Filter continued to mount, Bard convened a group to reexamine the adequacy of the design of the Recovery Filter as it relates to its ability to remain stable after implantation. The group established a number of action items, including the following: an investigation into what the minimum migration resistance specification of 50 mmHg had been based on, testing comparing the migration resistance of the Recovery Filter to other available filters, and testing comparing radial force difference between the range of available devices.

40.    This design review revealed that the minimum safety migration resistance specification was unsupported and had been set artificially low.  Bard developed this critical safety standard based on undocumented informal estimates obtained from unidentified physicians regarding the highest pressure below a filter that could be seen in the vena cava (35 mmHg). Bard then tested the device in three (3) sheep and claimed that the test results confirmed that that 35 mmHg was the highest pressure that could ever be seen in the vena cava under worst case conditions.  Bard then added a safety factor of 15 mmHg, and concluded that its filters would never migrate.  However, the test results from the sheep testing actually show pressure levels well above 50 mmHg.

41.    Further, Bard's own investigations concluded that multiple properly placed Recovery Filters migrated and caused death because the filters lacked adequate strength to resist clot challenges and/or lacked an adequate margin of safety to accommodate postiplacement distention of the vena

13

COMPLAINT

cava. Thus, further confirming that the safety specification of 50 mmHg was inadequate and that it's

testing, which predicted no migration failures, did not accurately reflect real world conditions.

42.     As part of its design review in early 2004, Bard also spoke with its two long time

physician consultants, Drs. Venbrux and Kaufman. They warned Bard that their input on the migration

resistance specification had just been an "estimate" and that Bard needed to consider revising the

migration resistance specification from 50 mmHg to 140 mmHg.  They further warned Bard that the

Recovery Filter was a "wimpy" filter and its radial force also needed to be increased to ensure stability.

43.     The design review also revealed that the Recovery Filter had migration resistance

values that were far below most other filters, including the Simon Nitinol Filter.  Bard's internal records

reveal that this was a known contributing factor to why Bard anchoring mechanism was insufficient to

assure stability.

44.     Bard knew that caval distension (expansion of the vena cava diameter beyond the size

at placement) could occur from multiple factors. These factors included: anesthesia, hydration

following medical procedure such as bariatric procedures, exertion from exercise, coughing, straining

during bowel movements. However, Bard to date has failed to make any efforts to determine the size of

vena cava distension that can occur.

## v.     Bard Conducts Silent Recall of Recovery Filter

45.     In or around April 2004 Bard, without notifying consumers of the design and

manufacturing flaws inherent in the Recovery Filter, began redesigning the Recovery Filter in an

attempt to correct those flaws.  The redesigned filter is known as the G2 Filter, which stands for

second generation Recovery Filter.  Once Bard began marketing and selling the redesigned

product in approximately August 2005, Bard quietly stopped selling the Recovery Filter. Of note,

however, Bard continued to market the Recovery Filter as being safer and more effective than all

COMPLAINT

prior filters up until the day the Recovery Filter was removed from the market.  Moreover, Bard never issued a recall for the Recovery Filter, which had a three (3) year shelf-life.

### C.  THE G2 FILTER SYSTEM

46.     On August 29, 2005, Bard obtained clearance to market the G2 Filter through the 510k process by having represented to the FDA that the G2 Filter was substantially equivalent in respect to safety and efficacy as the Recovery Filter. Bard represented that the differences between the Recovery Filter and the G2 Filter were primarily dimensional and no material changes or additional components were added.  The G2 Filter was only cleared for permanent implantation until January 15, 2008. Thus, between September 2005 through all of 2007, Bard sold two filters, the Simon Nitinol Filter and G2 Filter, with the exact same indications for use.

47.     Bard marketed the G2 Filter as having "enhanced fracture resistance," "improved centering," and "increased migration resistance" over all of its previous filters. Bard's marketing brochure states that supporting data was "on file." Yet when asked whether Bard ever shared the data with physicians, Bard's employee Robert Carr admitted that Bard refused to share the allegedly supporting data with physicians. In reality, Bard knew these claims were false and misleading. Bard knew that the Simon Nitinol Filter was far less likely to fracture, migrate, tilt, or perforate the vena cava.

48.     Further, Bard again failed to conduct adequate testing for long term safety and efficacy and failed to conduct adequate bench testing and animal studies, to ensure that the device would perform safely and effectively once implanted in the human body and subjected to reasonably foreseeable *in vivo* stresses. Furthermore, Bard still did not have a thorough and/or adequate understanding of vena caval dynamics. Not surprisingly, the G2 Filter's design caused

15

COMPLAINT

it to be of insufficient integrity and strength to withstand normal *in vivo* body stresses within the human body so as to resist fracturing, migrating, tilting, and/or perforating the inferior vena cava.

49.     For instance, the new minimum safety migration resistance design requirement for the G2 Filter was that its migration resistance had to be "statistically greater" than of the predicate Simon Nitinol Filter.  Bard's testing established that the G2 Filter failed this requirement. However, instead of going back and modifying the device further to ensure this safety requirement was met, Bard changed the minimum safety requirement to be that it just had to be better than the Recovery Filter, which was the device it was removing from the market because it migrated when challenged by large clots.

50.     Compounding this utter lack of concern for patient safety, Bard also decided that G2 filters could be reworked or reloaded on the jig used to form the filters up to five times in order to save money despite knowing that this would significantly decrease the migrations resistance of such devices. To allow for this, Bard readopted the same minimum safety migration resistance specification that had been adopted and proven to be utterly unsupported for the Recovery Filter, e.g. 50 mmHg.

51.     Thus, knowing that the specification and migration resistance of the Recovery Filter had been inadequate and was resulting in patient death, Bard's premarket design requirements was the device had to be at least as good as the Simon Nitinol Filter regarding migration resistance. When the G2 Filter failed that requirement, Bard simply changed the design requirement to the G2 Filter just having to be at least as good as the device that was known to be inadequate and causing patient death.

52.     The Redesigned G2 Filter also still had substantially less radial force than did the Simon Nitinol Filter.

53.     Also, like its predecessor, in addition to design defects, the G2 Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the absence of electropolishing and the existence of "draw markings" and circumferential grinding markings

16

COMPLAINT

on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2 Filter while *in vivo*. In particular, the G2 Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the G2 Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the afore mentioned exterior manufacturing defects makes the device more susceptible to fatigue failure and migration.

54.     As with the Recovery Filter, post-market safety data quickly revealed to Bard that the safety problems introduced with the Recovery Filter had not been corrected. Some representative examples of this knowledge include the following:

a.  Bard again received large numbers of adverse event reports reporting that properly placed G2 Filter were, *inter alia*, fracturing, migrating, excessively tilting, and perforating the vena cava once implanted and causing serious injuries and death.

b.  In a December 25, 2005 email, Bard's Medical Director, Dr. David Ciavarella, questioned why Bard was even selling the G2 filter given the reported complaints when the SNF had virtually no reported adverse events.

c.  Bard's investigations into comparative failure risks between the different available devices continually showed that the G2 filters posed a substantially higher risk of migration, tilt, perforation and fracture.

d.  By 2008, physicians were reporting that they believe there were fundamental design flaws with the G2 filter that was causing it to fracture and perforate and

COMPLAINT

requesting evidence as to what the reported complication rates were for the device. Bard's corporate policy was to refuse to disclose such failure rate data.

e. In a document dated April 1, 2010, senior Bard employees admit that there were known quality problems with the G2 line of filters that Bard's own sales force had lost faith with the product, and that doctors were refusing to use it. The document evidences Bard's plan to reduce the risk of tiling, perforation, fracture and migration by improving the anchoring system on the G2 line of filters. This became the Meridian filter, which was cleared through the 510(k) process on October 24, 2011.

**D. The G2 Express® and Eclipse® Filter**

55. On July 30, 2008, Bard obtained clearance to begin marketing the G2 Express® Filter (G2 Express) via the 510k process. The filter is the identical in design to the G2 Filter except that it has a hook at the top of the device, which allows it to be retrieved by snares, as well as Bard's Recovery Cone. The G2 Express Filter contained no design fixes to alleviate the stability, structural integrity and perforation problems that Bard knew to exist with the G2 Filter. Moreover, the post-market performance of the device confirmed the G2 Express Filter performed no different than the G2 Filter.

56. On January 14, 2010, Bard obtained clearance to begin marketing the Eclipse® Filter ("Eclipse Filter") via the 510k process. Bard obtained clearance by representing that the Eclipse Filter was substantially equivalent to the G2 Express Filter in respect to safety and efficacy and that the only change "was an improvement of the surface finish of the filter raw material wire by electropolishing the wire prior to forming the filter." Adding electropolishing to the manufacturing process was intended to improve structural integrity by removing manufacturing

COMPLAINT

defects caused by the manufacturing process, which were believed to be increasing the risk of fracture. This device did not incorporate any design changes to address the known stability, perforation and structural integrity design problems experienced by the device.

57. Both devices continued to experience the unacceptably high failure modes and patient injuries originally introduced with the design changed in the Recovery Filter.

**E.  The Meridian® Filter**

58. Bard obtained clearance form the FDA to market the Filter in August 2011.

59. Bard represented to the FDA that the Meridian Filter was substantially similar to the Eclipse Filter and could therefore be cleared via the less onerous 510(k) process.

60. The stated purpose and expectations for the design modifications made to the Meridian filter were that the  would not migrate, tilt, perforate the vena cava, or fracture.

61. However, Bard knew both based on its internal testing, inadequate as it was, as well as well as early post-market surveillance data that the Meridian Filter continued to suffer from inadequate design and manufacturing defects causing the device to have unreasonably high tendency to fracture, migrate, tilt and perforate the vena cava like its earlier generations of optional filters. Therefore, Bard knew long before Plaintiff was implanted with a Meridian filter, that the Meridian Filter was not substantially equivalent in safety or performance as the Simon Nitinol Filter, which mean Bard knew the Meridian Filter was misbranded and adulterated.

62. The design of the Meridian Filter is based on the Eclipse Filter, which in turn, is based entirely on the G2 Filter, which, in turn is base don the Recovery Filter. Like the Eclipse Filter, the wires used in the Meridian Filter are electropolished prior to the form of the filter. The only added feature to the Meridian Filter was a caudal anchoring systems added in an attempt to reduce the prevalence of filter causal migrations toward the groin. Therefore, despite knowing of

COMPLAINT

the high likelihood of perforation posed by its filter designs and the increased risk of fracture posed by perforation, Bard failed to include any design change in this product to ameliorate that risk.

**F.  The Denali® Filter**

63. At the same time Bard was working to fix design defects in the G2 Filter in what became the Meridian Filter, it was also working on the Denali® Filter ("Denali Filter") as another means to correct these design flaws. Bard obtained 510k clearance to begin marketing the Denali Filter on April 5, 2013 by claiming it was substantially similar to the Eclipse Filter in respect to safety and efficacy.

64. The Denali Filter incorporated design changes to fix design defects in the G2, G2 Express, Express, and Meridian Filters regarding the devices' inadequate stability, structural integrity and propensity to perforate the vena cava. These design changes included, *inter alia,* an improved anchoring system and "penetration limiters." The stated purpose and expectations of these design changes is that the device would not migrate, tilt, perforate the vena cava, or fracture.

65. Even after Bard released the Denali Filter, it failed to recall the older generation devices, including the Meridian, and/or to warn consumers about the increased risk posed by these devices. Instead, Bard conducted another silent recall. It stopped manufacturing the older device, sold remaining units, and allowed hospitals to use up units already on their shelves.

66. As a result, Plaintiff was implanted with a known defective device, when Bard alleged there was a safer alternative design available.

67. Plaintiff further alleges that Bard acted in willful, wanton, gross and total disregard for the health and safety of the users or consumers of Eclipse Filter, acted to serve their own

20

COMPLAINT

financial interests, and having reason to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

### G.  FDA WARNING LETTER

68. On July 13, 2015, the FDA issued a warning letter notifying Bard that its IVC Filters are adulterated and misbranded under federal law.

69. The FDA noted that the Recovery Cone Removal Systems are adulterated pursuant to 501(f)(1)(B) of 21 U.S.C. § 351(f)(1)(B) and misbranded pursuant to section 21 U.S.C. 352(o) because these devices have never been cleared or approved for use in humans. Thus, the FDA demanded that Bard immediately cease commercial distribution of its Recovery Cone Removal Systems.

70. The FDA notified Bard that its IVC Filters are adulterated and misbranded because the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Section 820, and that Bard failed to comply with adverse event reporting requirements of 21 C.F.R. 803.

71. The FDA cites numerous specific violations, including the failure to establish and maintain procedures to ensure that product complaints are adequately investigated and reported, and a consistent pattern of Bard underreporting the severity of injuries caused by device failures and failing to report device malfunctions all together. For instance, the FDA cites numerous examples of Bard reporting G2, and G2 Express and Eclipse Filter failures resulting in death and other serious injuries as if there was no patient injury involved. Other examples of Bard's

COMPLAINT

failures include the FDA finding Bard failed to establish and maintain a procedure to ensure that

the toxic acids and chemicals used in the manufacture of its filters were reduced to acceptable

levels prior to distribution.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

72. On or about October 13, 2013, Plaintiff Jeffrey Bottom underwent placement of a

Bard Meridian Filter at Memorial Hermann Southeast Hospital in Houston, Texas. On or about

February 13, 2020, Mr. Bottoms underwent a CT scan which revealed that the Meridian Filter

had fragmented into multiple pieces, those pieced had migrated throughout his body, including

into his heart. The fragmented device cannot be safely removed and has caused and will continue

to Plaintiff pain and suffering, loss of ability to enjoy life, and economic loss.

73. On or about March 5, 2010, Plaintiff underwent placement of a Bard G2®

Express Filter System Reference number RF400F, Lot number GFTH3217 ("G2 Express Filter")

at Washington Hospital. The device subsequently malfunctioned by, *inter alia*, tilting,

perforating his vena cava, fracturing. Due to the malfunction of the filter, Plaintiff has suffered

and continues to suffer severe pain and suffering and economic loss and has required extensive

medical treatment.

74. Secondary to the malfunction of the filter, Dr. Kou at Stanford Hospital

performed a complex procedure on or about January 21, 2016 to remove the G2 Express Filter

from Plaintiff and to venoplasty and stent his vein. While the main portion of the device was

removed, two fractured struts had migrated outside the vena cava and could not be retrieved.

Plaintiff will therefore have to spend the rest of his life wondering about what future harm theser

retained metal fragments may cause him. Plaintiff also suffered a procedural complication of a

COMPLAINT

lacerated inferior vena cava and resulting bleed. After extensive additional care he was

discharged, but was again hospitalized from or about February 1, 2016 through February 5, 2016

## TOLLING

75.     Plaintiff initially timely filed his complaint in the United States District Court for

the California North District on August 7, 2017.

76.     As part of a potential aggregate settlement involving several hundred plaintiffs,

Plaintiff and Defendants agreed to dismiss Plaintiff's case without prejudice so as to allow

plaintiff and several hundred other plaintiffs to determine if they would accept the tentative

settlement once the allocation process had been completed.

77.     The agreement included a tolling provision that provided should Plaintiff opt out

of the settlement, Plaintiff could refile his case and his renewed case would be deemed filed as of

the date of the original complaint for purposes of assessing any statute of limitations and statue

of repose defenses.

78.     Therefore, this case should be deemed as having been filed on August 7, 2017 for

assessing any statute of limitations or statue of repose defense.

## FRUADULENT CONCEALMENT

79.     Any applicable statutes of limitation have been tolled by the knowing and active

concealment and denial of material facts known by Bard when they had a duty to disclose those

facts.  They have kept Plaintiff and his physicians ignorant of vital information essential to the

pursuit of his claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of

obtaining delay on Plaintiff's part in filing on his causes of action. Bard's fraudulent

concealment did result in such delay.

COMPLAINT

80.     Bard is estopped from relying on the statute of limitations defense because Bard failed to timely disclose, among other things, facts evidencing the defective and unreasonably dangerous nature of the Recovery and G2 Filters.

81.     Bard was under a continuing duty to disclose the true character, quality and nature of the device that was implanted in the Plaintiff, but instead they concealed them.  Bard's conduct, as described in this Complaint, amounts to conduct purposely committed, which Bard must have realized was dangerous, needlessly reckless, without regard to the consequences or the rights and safety of Plaintiff.

## CORPORATE/VICARIOUS LIABILITY

82.     At all times herein mentioned, the Bard Defendants were the agents, servants, partners, co-conspirators and/or joint venturers of each of the other and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

83.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between the Bard Defendants such that any individuality and separateness between these Bard Defendants has ceased and these Defendants are the alter ego of the other and exerted control over one another.  Adherence to the fiction of the separate existence of the Bard Defendants as entities distinct from each other will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

84.     At all times herein mentioned, the Bard Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of

COMPLAINT

researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff.  As such, each Bard Defendant is individually, as well as jointly and severally, liable to the Plaintiff for Plaintiff's damages.

85.     At all times herein mentioned, the officers and/or directors of the Bard Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of the Recovery Filter and G2 Filter, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiff.

## COUNT I
## NEGLIGENCE

86.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-85 as though fully set forth herein.

87.     At all times relevant to this cause of action, the Bard Defendants were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the G2 Filters. Hereinafter the term G2 Filter shall be used to describe both the G2 Filter and G2 Express as the filters are identical.

88.     Bard designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the G2 Filter that was implanted in Plaintiff.

25

COMPLAINT

89.     Bard had a duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the G2 Filter so as to avoid exposing others to foreseeable and unreasonable risks of harm.

90.     Bard knew or reasonably should have known that the G2 Filter was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

91.     At the time of manufacture and sale of the G2 Filter, Bard knew or should have known that the G2 Filter:

        a.     Was designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the device;

        b.     Was designed and manufactured so as to present a unreasonable risk of migration of the device and/or portions of the device; and/or

        c.     Was designed and manufactured so as to present a unreasonable risk of the device tilting and/or perforating the vena cava wall and/or could not be removed percutaneously;

        d.     Was designed and manufactured to have unreasonable and insufficient strength or structural integrity to withstand normal placement within the human body.

92.     At the time of manufacture and sale of the G2 Filter, Bard knew or should have known that using the G2 Filter as intended or in a reasonably foreseeable manner created a significant risk of a patient suffering and severe health side effects including, but not limited to: hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; perforations of tissue, vessels and organs; and other severe personal injuries and diseases, which are permanent in nature, including, but not limited to, death,

COMPLAINT

physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, continued medical care and treatment due to chronic injuries/illness proximately caused by the device; and the continued risk of requiring additional medical and surgical procedures including general anesthesia, with attendant risk of life threatening complications.

93.     Bard knew or reasonably should have known that consumers of the G2 Filter would not realize the danger associated with using the device in its intended use and/or in a reasonably foreseeable manner.

94.     Bard breached their to duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the G2 Filter in, among other ways, the following acts and omissions:

a.      Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b.      Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the likelihood of potential harm from other devices and treatment options available for the same purpose;

c.      Failing to use reasonable care in manufacturing the product and producing a product that differed from their design or specifications or from other typical units from the same production line;

d.      Failing to use reasonable care to warn or instruct, including pre and post-sale, Plaintiff, Plaintiff's physicians, or the general health care community about

COMPLAINT

the Recovery Filter and G2 Filter's substantially dangerous condition or about facts making the product likely to be dangerous;

e.      Failing to perform reasonable pre and post-market testing of the Recovery Filter and G2 Filter to determine whether or not the product was safe for its intended use;

f.      Failing to provide adequate instructions, guidelines, and safety precautions, including pre and post-sale,  to those persons to whom it was reasonably foreseeable would prescribe, use, and implant the Recovery Filter and G2 Filter;

g.      Advertising, marketing and recommending the use of the Recovery Filter and G2 Filter, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with and inherent in the use of these filter systems;

h.      Representing that the Recovery Filter and G2 Filter were safe for their intended use when, in fact, Bard knew and should have known the products were not safe for its intended purpose;

i.      Continuing to manufacture and sell the Recovery Filter and the G2 Filter with the knowledge that said products were dangerous and not reasonably safe, and failing to comply with good manufacturing regulations;

j.      Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Recovery Filter and the G2 Filter so as to avoid the risk of serious harm associated with the use of these filter systems;

COMPLAINT

k.      Advertising, marketing, promoting and selling Recovery Filter and G2 Filter for uses other than as approved and indicated in the product's label;

l.      Failing to establish an adequate quality assurance program used in the manufacturing of the Recovery Filter and G2 Filter.

m.      Failing to establish and maintain and adequate post-market surveillance program;

n.      By marketing the device as retrievable when it knew there was no device cleared as safe and effective to retrieve the device by the FDA.

A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the before-mentioned acts and omissions.

95.     As a direct and proximate result of the foregoing negligent acts and omissions by the Bard Defendants, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device.

## COUNT II
## STRICT LIABILITY FAILURE TO WARN

96.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-95 as though fully set forth herein.

97.     Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the G2 Filter, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers.

COMPLAINT

98.    At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, Defendants knew or should have known the device presented an unreasonable danger to users of the product when put to its intended and reasonably anticipated use.

99.    Specifically, Bard knew or should have known at the time they manufactured, labeled, distributed and sold the G2 Filter, which was implanted in Plaintiff, that the G2 Filter, *inter alia*, posed a significant and higher risk for fracture, migration, tilting, perforation of the vena cava wall and an inability to remove the filter percutaneously and resulting serious injuries, including death, than other similar devices, including Bard's own Simon Nitinol Filter.

100.    Yet, Bard chose to falsely market the G2 Filter as being safer and more effective in respect to stability and structural integrity than all of its previous devices, including the Simon Nitinol Filter.

101.    Bard further failed to accurately disclose the prevalence of such failures and resulting injuries.

102.    Bard also downplayed the seriousness of the device failures and resulting injuries associated with the G2 Filter by reporting that the failures had only been "reported" and that some of these were allegedly reported in association with patient death. The truth, however, was that Bard knew these failures had been confirmed and that these events had also been confirmed to have directly caused patient death.

103.    The FDA has recently found that Bard violated FDA minimum safety guidelines by misreporting numerous device failures associated with G2 and G2 Express Filters. Specifically, the FDA sampled approximately 42 complaint files during an inspection. Of those complaint files, the FDA found that Bard had reported numerous device failures resulting in

COMPLAINT

serious patient injuries, including death, as if no injury had occurred. The FDA further found that Bard failed to report numerous device malfunctions that could have caused serious injury or death as required.

104.    Bard also failed to reveal that it knew internally that there were design problems with these devices, which were causing these failures, and that new safer devices were about to be released.

105.    The foreseeable risks of harm from the G2 Filter could have been reduced or avoided by providing reasonable instructions and/or warnings and the failure to provide those instructions or warnings makes the G2 Filter unreasonably dangerous and renders the device defective.

106.    No health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or ultimate users of the device.

107.    The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

108.    Plaintiff and Plaintiff's health care providers used the device in a normal, customary, intended, and foreseeable manner, namely as a surgically implanted device used to prevent pulmonary embolisms.

109.    Therefore, the G2 Filter implanted in Plaintiff was defective and unreasonably dangerous at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

110.    The G2 Filter implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

COMPLAINT

111.    As a direct and proximate result of Defendants' lack of sufficient warning and/or instructions, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

## COUNT III
## STRICT LIABILITY MANUFACTURING DEFECT

112.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 111 as though fully set forth herein.

113.    Bard designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the G2 Filter that was implanted into Plaintiff. The G2 Filter was unreasonably dangerous because of a manufacturing defect in that it was different from its intended design and failed to perform as safely as the intended design would have performed.

114.    The G2 Filter implanted in Plaintiff was in a condition unreasonably dangerous and the filter was expected to and did reach the Plaintiff and/or her physicians without substantial change affecting the filter.

115.    Plaintiff and Plaintiff's health care providers used the device in a manner that was reasonably foreseeable to Bard.

116.    As a result of this condition, the product injured Plaintiff and failed to perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner.

117.    As a direct and proximate result of the G2 Filter's manufacturing defect, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental

COMPLAINT

anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY**

118.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-112 as though fully set forth herein.

119.    At all times relevant to this action, Bard designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the G2 Filter for use as a surgically implanted device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

120.    The G2 Filter System did not conform to the express representations made by Defendants through sales representatives, consultants, printed materials, and other advertising and marketing efforts. Plaintiff and her physicians relied on these express representations in the purchase, use and implantation of the G2 Filter in the Plaintiff.

121.    Bard knew of the intended and reasonably foreseeable use of the G2 Filter, at the time they marketed, sold, and distributed the product for use by Plaintiff, and warranted the product to be of merchantable quality, and safe and fit for its intended use.

122.    Bard represented and warranted to the healthcare community, Plaintiff and Plaintiff's health care providers, that the G2 Filter was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

123.    The representations and warranties made by Bard were false, misleading, and inaccurate because the G2 Filter was defective and unreasonably dangerous, and the device was

33

not of merchantable quality when used in its intended and/or reasonably foreseeable manner. At the time of Plaintiff's purchase of the G2 Filter from Bard regarding centering of the filter, Bard knew the device was designed in such a way that it would not perform as intended and expected in respect to stability and structural integrity and that it suffered device failures at rates far higher than other available devices.

124.     Plaintiff and Plaintiff's health care providers reasonably relied on the superior skill and judgment of Bard as the designers, researchers and manufacturers of the product, as to whether G2 Filter was of merchantable quality and safe and fit for its intended use, and also relied on the warranty of merchantability and fitness for the particular use and purpose for which the G2 Filter was manufactured and sold.

125.     Bard placed the G2 Filter into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the G2 Filter was manufactured and sold.

126.     Bard breached their warranty because their G2 Filter was not fit for its intended use and purpose.

127.     As a proximate result of the Bard Defendants breach of their implied warranties, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

128.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-127 as though fully set forth herein.

COMPLAINT

129.     At all times relevant to this action, Defendants designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the G2 Filter for use as a retrievable surgically implanted device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

130.     At the time and place of the sale, distribution, and supply of the Defendants' G2 Filter to Plaintiff by way of Plaintiff's health care providers and medical facilities, Defendants expressly represented and warranted, by labeling materials submitted with the product, that the G2 Filter System was safe and effective for its intended and reasonably foreseeable use, and that it could be retrieved at any time by use of the Recovery Cone Removal System.

131.     Defendants knew of the intended and reasonably foreseeable use of the G2 Filter and the Recovery Cone Removal System, at the time they marketed, sold, and distributed the products for use by Plaintiff, and impliedly warranted the products to be of merchantable quality, and safe and fit for its intended use. Defendants impliedly represented and warranted to the healthcare community, Plaintiff and Plaintiff's health care providers, that the G2 Filter and Recovery Cone Removal System were of merchantable quality and fit for their ordinary purposes for which the products were intended and marketed.

132.     The representations and implied warranties made by Defendants were false, misleading, and inaccurate because the G2 Filter and the Recovery Cone Removal System were defective and unreasonably dangerous, and not of merchantable quality when used in their intended and/or reasonably foreseeable manner. Specifically, at the time of Plaintiff's purchase of the products from the Defendants, through Plaintiff's physicians and medical facilities, it was not in a merchantable condition in that:

COMPLAINT

a.      It was designed in such a manner so as to be prone to a statistically high incidence of failure, including fracture, migration, excessive tilting, and perforation of the inferior vena cava;

b.      It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and

c.      It was manufactured in such a manner so that the exterior surface of the G2 Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

d.      There was no FDA device cleared or approved as safe and effective to be able to retrieve the device despite Bard's labeling stating that the Recovery Cone Removal System could be used for this purpose.

133.    Plaintiff and Plaintiff's health care providers reasonably relied on the superior skill and judgment of Defendants as the designers, researchers and manufacturers of the product, as to whether G2 Filter was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the G2 Filters were manufactured and sold.

134.    Defendants placed the G2 Filters into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the G2 Filter was manufactured and sold.

135.    Defendants breached their implied warranty because the G2 Filters and Recovery Cone Removal Systems are not fit for their intended use(s) and/or the use(s) reasonably foreseeably by the Defendant.

COMPLAINT

136.   As a proximate result of Defendants breach of their implied warranties, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

## COUNT VI
## FRAUDLENT CONCEALMENT

137.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-131 as though fully set forth herein.

138.   At all times relevant to this Count, and as detailed *supra*, Defendants fraudulently concealed material information concerning the G2 Filter and the Recovery Cone Removal System from Plaintiff, Plaintiff's health care providers, and the general medical community relating to the safety and efficacy of these devices.

139.   Defendants marketed and labeled the G2 Filter as if it could be legally and safely retrieved using the Recovery Cone Removal System. Defendants concealed, however, that they had never obtained clearance to market the Recovery Cone Removal System from the FDA.

140.   Defendants marketed the G2 Filter as being safer and less likely to fracture, migrate, or tilt than other devices, including the Simon Nitinol Filter. Yet, Defendants concealed that they were aware of information suggesting that the G2 Filter was substantially more likely to fracture, migrate, tilt, or perforate the vena cava and other internal organs and cause injuries, than were other available IVC Filters.

141.   Defendants were also aware at the time Plaintiff's filter was distributed that electropolishing reduced the risk of fracture and that it was industry standard for NITINOL medical devices. Yet, Defendants concealed this information from Plaintiff and her physicians.

37

COMPLAINT

142.    Defendants were also aware that numerous deaths and serious injuries had been confirmed to have been caused by failures of G2 filters. Yet, Defendants concealed this information from Plaintiff and her physicians. Instead, Defendants only warned that people with filters had been reported to die and suffer serious injuries but not that any of these events were confirmed to have been caused by Bard's filters.

143.    Bard also concealed information that it new internally that there were design issues relating to stability and structural integrity with the G2 Filter was creating quality problems and cause device failures once implanted and that Bard was about to introduce several new devices to address these problems.

144.    Defendants also marketed the filter to the medical community and Plaintiff's health care providers as if the device was safe and effective for the off-label uses for which it was used in this case. Yet, concealed from consumers that these were off-label uses that had never been cleared by the FDA.

145.    Plaintiff and Plaintiff's health care providers could not reasonably have discovered the claims made herein until at the earliest the device was discovered to have perforated Plaintiff's vena cava wall and learned of her health care providers' inability to remove the filter.

146.    The Defendants are and were under a continuing duty to disclose the true character, quality and nature of the device that was implanted in Plaintiff, but instead they concealed them.  Defendants' conduct, as described in this complaint, amounts to conduct purposely committed, which Defendants must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiff.

COMPLAINT

147.     As a proximate result of Defendants fraudulent concealment, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

## COUNT XII - NEGLIGENT MISREPRESENTATION

148.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-142 as though fully set forth herein.

149.     At all times relevant to this cause, and as detailed *supra*, Bard negligently provided Plaintiff, Plaintiff's health care providers, and the general medical community with false or incorrect information, or omitted or failed to disclose material information concerning the G2 Filter that the Defendant's knew or should have known was false and misleading, the defendant's made these false and misleading statements intending that the statements would be would be relied on by the Plaintiff, her health care providers and the general medical community and the Plaintiff and her physicians justifiably relied on the Defendant's false and misleading statements to include, but not limited to, misrepresentations relating to the following subject areas:

a.     The safety of the G2 Filter;

b.     The efficacy of the G2 Filter;

c.     The rate of failure of the G2 Filter; and

d.     The approved uses of the G2 Filter.

150.     The false and misleading information distributed by Bard to the public, the medical community and Plaintiff's health care providers was in the form of reports, press

COMPLAINT

releases, advertising campaigns, labeling materials, print advertisements, commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the G2 Filter. Bard made the foregoing misrepresentations knowing that they were false or without reasonable basis.  These materials included instructions for use and warning document that was included in the package of the G2 Filter that was implanted in Plaintiff.

151.    The foregoing representations and omissions by Bard were in fact false and at the time Plaintiff used the G2 Filter, Plaintiff and Plaintiff's health care providers were unaware of said Defendants' negligent misrepresentations and omissions.

152.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community,  including Plaintiff's health care providers; to gain the confidence of the public and the medical community,  including Plaintiff's health care providers; to falsely assure them of the quality of the G2 Filter and its fitness for use; and to induce the public and the medical community,  including Plaintiff's healthcare providers to request, recommend, prescribe, implant, purchase, and continue to use the G2 Filter.

153.    The foregoing representations and omissions by Defendants were in fact false. The G2 Filter is not safe, fit, and effective for human use in its intended and reasonably foreseeable manner. The use of the G2 Filter is hazardous to the user's health, and said device has a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries Plaintiff suffered. Further, the device has a significantly higher rate of failure and injury than do other comparable devices.

154.    Plaintiff, Plaintiff's health care providers and general medical community reasonably relied upon misrepresentations and omissions made by Bard where the concealed and

COMPLAINT

misrepresented facts were critical to understanding the true dangers inherent in the use of the G2 Filter.

155.     Plaintiff and Plaintiff's health care provider's reliance on the foregoing misrepresentations and omissions by Bard was the direct and proximate cause of Plaintiff's injuries as described herein.

156.     As a proximate result of the Bard Defendants negligent misrepresentations, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device. Plaintiff is also exposed risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the fractured G2 Filter strut to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

<u>**COUNT VIII**</u>
<u>**FRAUDLENT MISREPRESENTATION AS TO BARD**</u>

157.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-156 as though fully set forth herein.

158.     At all times relevant to this cause, and as detailed *supra*, Defendants intentionally made false statements of material fact to the Plaintiff, Plaintiff's health care providers, and the general medical community or intentionally omitted or intentionally failed to disclose material information concerning the G2 Filter that the Defendant's knew the statements were in fact false and misleading or made the statements knowing they did not know whether the statements were true or false, the Defendants' made these false and misleading statements intending that the statements would be relied on by the Plaintiff, the Plaintiff's health care providers and the

COMPLAINT

general medical community and the Plaintiff and her health care providers relied upon the Defendant's false and misleading statements.

159.    The Defendant's false and misleading statements concerned the following material facts and subjects:

        a.      The safety of the G2;

        b.      The efficacy of the G2 Filter;

        c.      The rates of failure of the G2 Filter; and

        d.      The approved uses of the G2 Filter and Recovery Cone Removal System.

160.    The false and misleading information distributed by Defendants to the public, the medical community and Plaintiff's health care providers was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the RECOVERY®, the G2 and the G2 X Filters. Defendants made the foregoing misrepresentations knowing that they were false or without reasonable basis.  These materials included instructions for use and warning document that was included in the package of the G2 X Filter that was implanted in Plaintiff.

161.    These statements included marketing the G2 Filter as if it was safer and more effective than Bard's prior IVC Filters, including the Simon Nitinol Filter.

162.    Defendants further falsely labeled the G2 Filter that it could be safely removed by Recovery Cone Removal System.

163.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community,  including Plaintiff's health care providers; to gain the confidence of the public and the medical community,  including Plaintiff's health care

COMPLAINT

providers; to falsely assure them of the quality of the RECOVERY®, the G2® and the G2® X

Filters and its fitness for use; and to induce the public and the medical community,  including

Plaintiff's healthcare providers to request, recommend, prescribe, implant, purchase, and

continue to use the RECOVERY®, the G2® and the G2® X Filters.

164.    The foregoing representations and omissions by Defendants were in fact false.

The RECOVERY®, the G2® and the G2® X Filters are not safe, fit, and effective for human use

in its intended and reasonably foreseeable manner. The use of the RECOVERY®, the G2® and

the G2® X Filters are hazardous to the user's health, and said device has a serious propensity to

cause users to suffer serious injuries, including without limitation, the injuries Plaintiff suffered.

Further, the device has a significantly higher rate of failure and injury than do other comparable

devices.

165.    In reliance upon the false and negligent misrepresentations and omissions made

by Defendants, Plaintiff and Plaintiff's health care providers were induced to, and did use the

G2® X Filter, thereby causing Plaintiff to sustain severe and permanent personal injuries.

166.    Defendants knew and had reason to know that Plaintiff, Plaintiff's health care

providers, and the general medical community did not have the ability to determine the true facts

intentionally and/or negligently concealed and misrepresented by Defendants, and would not

have prescribed and implanted same, if the true facts regarding the device had not been

concealed and misrepresented by Defendants.

167.    Defendants had sole access to material facts concerning the defective nature of the

product and its propensity to cause serious and dangerous side effects in the form of dangerous

injuries and damages to persons who are implanted with the RECOVERY®, the G2® and the

G2® X Filters.

COMPLAINT

168.    At the time Defendants failed to disclose and misrepresented the foregoing facts, and at the time Plaintiff used the G2® X Filter, Plaintiff and Plaintiff's health care providers were unaware of said Defendants' negligent misrepresentations and omissions.

169.    Plaintiff, Plaintiff's health care providers and general medical community reasonably relied upon misrepresentations and omissions made by Defendants where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the RECOVERY®, the G2 and the G2® X Filters.

170.    Plaintiff and Plaintiff's health care provider's reliance on the foregoing misrepresentations and omissions by Defendants' was the direct and proximate cause of Plaintiff's injuries as described herein.

171.    As a proximate result of the Bard Defendants fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device. Plaintiff is also exposed risk of requiring additional medical and surgical procedures, including risk of life threatening complications and ongoing medical care to monitor the fractured G2® Filter strut to ensure that it does not cause additional or further injury, in an amount to be determined at trial.

## **PUNITIVE DAMAGES AS TO BARD**

172.    Plaintiff re-alleges each and every allegation in this Complaint and incorporates each allegation into this Count, as if set forth at length, in its entirety.

173.    Plaintiff is entitled to an award of punitive and exemplary damages based upon Bard's intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare.

COMPLAINT

174.    Bard had knowledge of, and were in possession of evidence demonstrating that, the G2 Filter was defective and unreasonably dangerous and had a substantially higher failure rate than did other similar devices on the market. Yet, Bard failed to:

a.    Inform or warn Plaintiff or her health care providers of the dangers;

b.    To establish and maintain an adequate quality and post-market surveillance system; and

c.    Recall the G2 Filter from the market

175.    Bard acted to serve their own interests and having reasons to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, and consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

176.    As a direct, proximate, and legal result of Bard's acts and omissions a described herein, and Plaintiff implantation with Bard's defective product, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## **PRAYER FOR DAMAGES**

WHEREFORE, Plaintiff demands judgment against Defendants under all causes of action for:

a.    General (non-economic) damages, including, without limitation, past and future mental anguish and physical suffering; loss of enjoyment of life, and other consequential damages as allowed by law and in amount to be determined by the jury;

b.    Special (economic) damages, including, without limitation, medical expenses;

c.    Costs of this action;

d.    Prejudgment interest as allowed by law;

COMPLAINT

e.      Post-judgment interest at the highest applicable statutory or common law rate from the date of judgment until satisfaction of judgment;

f.      Punitive Damages; and

g.      Such other additional and further relief as Plaintiff may be entitled to in law or in equity.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all triable issues.


Dated:  February 28, 2022                    Respectfully Submitted,



/s/ Troy A. Brenes_____
Troy A. Brenes
BRENES LAW GROUP, P.C.
100 Spectrum Center Drive, Ste. 330
Irvine, California 92618
P: 949.397.9360
Tbrenes@breneslawgroup.com

COMPLAINT